**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

PHILIP W. SCHOFIELD,  :
                       :
    Plaintiff,         :  **Case No. 2:22-cv-3025**
                       :
  v.                   :  **Chief Judge Algenon L. Marbley**
                       :
AMAZON LOGISTICS,      :  **Magistrate Judge Kimberly A. Jolson**
                       :
                       :
    Defendant.         :

## <u>OPINION AND ORDER</u>

This matter is before this Court on Defendant Amazon Logistics's ("Amazon") Motion for Summary Judgment. (ECF No. 25). For the reasons set forth below, Defendant's Motion for Summary Judgment is **DENIED.**

## I.    BACKGROUND

This case arises from Plaintiff, Phil Schofield's, termination from his role as an Amazon Operations Manager. Amazon says that it fired Mr. Schofield because he asked a supervisee, Kaitlyn Rohrer, to work for approximately one hour without clocking in. When he says he was first confronted with the accusation—at the time of his termination—Mr. Schofield denied ever asking Ms. Rohrer to work off the clock and asserted to his superiors that he was being fired due to his age. He makes the same assertion now.

### A.  Factual Background

#### 1.  *Plaintiff's Employment with Defendant*

Mr. Schofield, born in 1957 and 64 years old at the time of his termination, was hired by Amazon to work as an Operations Manager in Central Ohio. (ECF No. 25-1 at 8; 25). At the time of his termination, Mr. Schofield was the oldest manager at his Delivery Station. (ECF No. 26-1

at ¶ 34).  An Amazon Operations Manager's responsibilities include leading hourly employees and their front-line supervisors.  (ECF No. 25-1 at 26).  Operations Managers oversee the shift's flow of packages, manage staffing, and produce a report of the shift's productivity.  (*Id.*).  An Amazon HR Business Partner who was involved in Mr. Schofield's termination, Shawn Brinkman, explains in a declaration that Operations Managers are also responsible for assisting employees in complying with Amazon policies around the hours that they work.  (ECF No. 25-2 ¶ 8).  Of course, Operations Managers are prohibited from asking associates to work off the clock.  (*Id.* ¶ 9).  Mr. Schofield signed and acknowledged this policy.  (ECF No. 25-1 at 25).

In April 2021, Mr. Schofield was transitioned to a new Delivery Station in Columbus, Ohio, and Senior Station Manager Andre Hampton became his supervisor.  (ECF No. 25-2 ¶¶ 4-7).  One of his supervisees at the new Station was Kaitlyn Rohrer, who Mr. Schofield and his colleague would soon recommend be promoted to a Process/Shift Assistant.

### 2. Ms. Rohrer Reports that Mr. Schofield Offered to Modify Timecard for October 23

On November 1, 2021, Mr. Schofield came upon Ms. Rohrer in the break room.  According to a statement Mr. Schofield gave after the incident and a more recent declaration, Ms. Rohrer looked upset and was staring intently at her phone.  (ECF No. 26-1 at 12; 5 at ¶ 16).  Ms. Rohrer explained to Mr. Schofield that she was concerned because she had worked twelve days in a row, in violation of an Amazon policy restricting employees to working only six days in a row.  (ECF No. 26-1 ¶ 16).  Mr. Schofield asserts that Ms. Rohrer said she was worried she was in trouble and was planning to speak to an HR Business Partner, Hamid Nahari.  (*Id.*).  In his declaration, Mr. Schofield explains that Ms. Rohrer's disclosure surprised him, and he asked Ms. Rohrer how she did not realize how many days she had worked.  (*Id.*; *id.* at 12).  According to Mr. Schofield, Ms. Rohrer did not have an answer.  (*Id.* at 12).

2

Mr. Schofield and Ms. Rohrer's narratives then diverge.  In a meeting with Mr. Nahari a few minutes later, Ms. Rohrer stated that Mr. Schofield had offered to "delete punches" from October 23rd for her.  She submitted a statement explaining her recollection that Mr. Schofield "said he would delete my punches so that I would not get in trouble for working too many days in a row."  (ECF No. 25-2 at 8).

Mr. Schofield, however, says he suggested that if one of the twelve days at issue was the night of October 23 through the morning of October 24, that Ms. Rohrer should explain to Mr. Nahari that he had asked her to come in that day, and that "maybe that day wouldn't be held against her."  (ECF No. 26-1 at 5).  Mr. Schofield explains that he asked Ms. Rohrer to work on the evening of October 23 due to a shortage of associates trained in the necessary truck door release procedure.  (*Id.* at 5-6).  In Mr. Schofield's telling, he contacted Ms. Rohrer and asked if she was available to come in and cover the shift that evening but was unaware that she had already worked at least six days in a row.  (*Id.* ¶ 19).  Indeed, Mr. Schofield sought and received Senior Station Manager Mr. Hampton's approval to have Ms. Rohrer come in on evening of October 23rd.  (*Id.*).  In Mr. Schofield's experience, when there was a "business necessity" for employees to work more than six days in a row, employees rarely received discipline for violating the policy.  (*Id.* ¶ 17).

After Ms. Rohrer's meeting with Mr. Nahari, Mr. Nahari interviewed Mr. Schofield, asking him about Ms. Rohrer's twelve-day work streak and whether he had indeed offered to delete her punches.  (ECF No. 26-1 ¶ 23).  Mr. Schofield denied offering to delete punches, which he explains he did not have the ability to do.  (*Id.*).  Mr. Schofield wrote a signed statement explaining his recollection of the incident, stating he suggested to Ms. Rohrer that because "we asked you to come in the night of Oct 23/24 for sure," "maybe [Mr. Nahari] has a remedy to change the situation and your time."  (*Id.* at 12).  According to Amazon HR, Mr. Schofield's process for selecting

someone to cover the shift should have begun with checking various employees' hours to see who would not violate policy by coming in.  (ECF No. 25-2 ¶ 22; ECF No. 25-3 at 9).

### 3.  *Central Ohio Managers Learn They May Be Reassigned*

On November 3, all the managers of Amazon's Central Ohio Delivery Centers participated in a mandatory telephone conference.  (*Id.* ¶¶ 11-12).  During the call, the Regional HR Director explained that there were too many managers in Central Ohio, and several would be "redeployed" to other areas.  (*Id.*).  At the conclusion of the call, it was not clear to Mr. Schofield what to expect regarding his position.  (*Id.*).

### 4.  *Ms. Rohrer Reports that Mr. Schofield Asked Her to Work Off-the-Clock on October 19*

Two days later, on November 3, Ms. Rohrer spoke with Mr. Nahari again and raised an unrelated timekeeping issue.  She claimed that Mr. Schofield had asked her to come into work an hour early on October 19, but not to clock in because she had already worked nearly 12 hours that day and it would "mess up [her] hours."  (ECF No. 25-2 at 8).  According to Ms. Rohrer, Mr. Schofield assured her that he would "put in a ticket" to make sure she was paid for that hour, and she asked Mr. Nahari whether such a ticket had been entered.  (*Id.*).  Subsequent investigation revealed that no such ticket existed.  (ECF No. 25-2 at 17).  Ms. Rohrer revised her earlier Incident Form to reflect the new, October 19 issue.  (ECF No. 25-2 at 8).

Mr. Nahari then expanded on his earlier investigation.  He looked at Ms. Rohrer's timecard, which reflected that she did not clock in at 11 p.m. on October 19.  (ECF No. 25-2 at 10).  Mr. Nahari also secured a statement from another staff member who saw Ms. Rohrer at the Station around 11 p.m., which corroborated Ms. Rohrer's claim that she was present at work at that time. (ECF No. 25-2 at 12).

4

On November 4, Mr. Nahari distributed an Investigation Summary to Station leadership detailing both time-related incidents. (*Id.* at 14). Mr. Nahari went out on medical leave on November 5, so Mr. Brinkman, another HR Business Partner, took over the investigation. Mr. Brinkman redistributed the investigation summary, adding a conclusion that Mr. Schofield had violated Amazon's Standards of Conduct, Category 1, by "intentionally making entries on another associate's timecard/sheet, or falsely altering a timekeeping document." (*Id.* at 22). The revised Investigation Summary recommended termination "due to [Mr. Schofield] knowingly telling the associate to work off the clock and putting the associate a[t] risk by working 12 days in a row." (*Id.*).

A Senior Regional Leader responded on November 8, asking whether "we have any witnesses of the conversation between Phil and Kaitlyn on what was said/not said?" (*Id.* at 21). It is not clear to which conversation she was referring, but she expressed her view that it "[s]ounds like we have caught [Mr. Schofield] in a lie so at this point I'm erroring [*sic*] on the side of the associate but just curious what Phil's exact direction was that he communicated." (*Id.*). The next day, Mr. Brinkman obtained a statement from another employee, Colin Puff, who explained that on November 2, Mr. Rohrer had mentioned to both him and Mr. Schofield that she had worked twelve days in a row. (Id. at 19). According to Mr. Puff, "[Ms. Rohrer] nonchalantly said that [Mr. Schofield] offered to delete the punches from the day that [Ms. Rohrer] only worked 1 hour on the previous Saturday night shift. [Mr. Schofield] then repeated that notion of deleting the punches . . ." (*Id.*). The statement made no mention of off-the-clock work on October 19.

In an affidavit submitted by Mr. Brinkman, he states that he also "spoke with Mr. Schofield" after he took over the investigation on November 4. (ECF No. 25-2 at 4 ¶ 27). He does not explain what he spoke with Mr. Schofield about.

*5. Mr. Schofield is Terminated*

After his initial conversation with Mr. Nahari about whether he offered to delete Mr. Rohrer's October 23 punches, the next time Mr. Schofield says he heard about Ms. Rohrer's timekeeping was during a phone call on November 9 in which he was terminated. (ECF No. 26-1 ¶ 25). During that call, Senior Station Manager, Mr. Hampton, and Mr. Brinkman did not tell Mr. Schofield that was being terminated for allegedly offering to delete Ms. Rohrer's punches. (*Id.*). Instead, Mr. Hampton and Mr. Brinkman, who completed Mr. Nahari's initial investigation, informed Mr. Schofield that he was being fired for allegedly telling Ms. Rohrer to work off-the-clock on October 19. (*Id.*). According to Mr. Schofield, this was the first time he was aware that he was accused of asking Mr. Rohrer to work off-the-clock. (*Id.*; ECF No. 25-1 at 45).

On the call with his supervisors, Mr. Schofield immediately denied asking Ms. Rohrer to work off-the-clock, clarifying that he did indeed ask Ms. Rohrer to come in at 11 p.m. to ensure she had adequate time to prepare before the 12 p.m. shift, but that he had no awareness of how many hours she had worked already on the 19th and did not ask her to work without clocking in. (ECF No. 26-1 ¶ 26-27). Indeed, it was Mr. Schofield's perspective that working too many hours in a day or too many days in a row was not punished if there was a business necessity, as there was on the 19th. During the call, Mr. Schofield stated that he believed that he believed the proffered reason for his termination was pretextual, and that he was being fired for ageist reasons. (*Id.* at 28). Mr. Hampton and Mr. Brinkman told Mr. Schofield that the decision to terminate him was "final." (ECF No. 25-1 at 45). Mr. Schofield learned two weeks later that the decision was appealable, but that, having relied on erroneous information, he missed the seven-day window in which he could appeal. (*Id.* at 47).

When he was hired, Mr. Schofield was living in Rhode Island and Amazon agreed to advance him some $84,000 in relocation benefits to be paid off over time. (ECF No. 25-1 at 151). Because he was terminated, Amazon explains that Mr. Schofield must repay the company $29,989.07, due immediately.

About a month after Mr. Schofield was terminated, Amazon hired Operations Manager Frank Graves to replace him. (Brinkman Decl. ¶ 36). Mr. Graves was born in 1970 and was 51 years old at the time that he was hired. (*Id.* at 35).

## B. Procedural Background

After his termination, Mr. Schofield filed a charge of age discrimination in violation of Chapter 4112 of the Ohio Revised Code with the Ohio Civil Rights Commission. (ECF No. 4 ¶ 17). After obtaining a right to sue letter, Mr. Schofield filed a lawsuit in the Franklin County Court of Common Pleas against Amazon. (ECF No. 1 ¶ 1). Amazon then removed the lawsuit to this Court on the basis of diversity jurisdiction. (*See id.*). Amazon answered the Complaint in August 2022. (ECF No. 10). After mediation failed in August 2023, Amazon filed this Motion for Summary Judgment. (ECF No. 25). The Motion is now fully briefed and ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact[,] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716-17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the non-moving party; evidence

that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that after the burden shifts, the non-movant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

### III.    LAW & ANALYSIS

Plaintiff brings age discrimination claims against Defendants based on Ohio's employment discrimination laws, Ohio Rev.Code Ann. §§ 4112.02 and 4112.052. The Court may rely on cases interpreting the Age Discrimination in Employment Act ("ADEA") in its analysis of Mr. Schofield's state law claim. *See City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569 (1998); *Cochran v. Columbia Gas of Ohio, Inc.*, 138 Ohio App.3d 888 (2000) ("[W]hen intepreting [Ohio Revised Code] chapter 4112, it is appropriate to look at analogous federal statutes and case law.").

Plaintiff does not present any direct evidence—age related comments, for example—that Amazon terminated his employment for discriminatory reasons. Therefore, the Court will analyze Plaintiff's age discrimination claims according to the familiar *McDonnell Douglas* burden shifting analysis, derived from Title VII case law. *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002) (explaining that "claims of discrimination brought pursuant to Title VII . . . and the ADEA . . . are analyzed under the same framework."); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). First, Plaintiff must present evidence of a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If Plaintiff succeeds in demonstrating a *prima facie* case of discrimination, the burden shifts to Defendant to produce evidence of a legitimate, nondiscriminatory reason for taking the action that Plaintiff alleges was discriminatory. *Id.* at 802-03. Finally, if Defendant states a legitimate, nondiscriminatory reason for taking the action it did, the burden shifts back to Plaintiff to produce evidence that Defendant's reason was a mere pretext for discrimination. *Id.* at 804-05.

### A. Prima Facie Case

This Court must first determine whether Plaintiff is able to establish a *prima facie* case of age discrimination. A plaintiff must demonstrate that he: "(1) is a member of a protected class, (2) was qualified for the position in question, (3) suffered an adverse employment action despite his or her qualifications, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age." *Collins v. City of Mason*, 153 N.E.3d 484, 490-91 (Ohio Ct. App. 2020). To establish the fourth prong, a plaintiff may also show that a younger employee was "similarly situated in all relevant respects," but treated differently. *Brothers v. NCR Corp.*, 885 F. Supp. 1043, 1048 (N.D. Ohio 1995). The protected class under Ohio's age discrimination statute includes all persons at least forty years of age. Ohio Rev. Code § 4112.14(A).

Given that Mr. Schofield was 64 years of age at the time of his termination, the Parties do not dispute that he is a member of the class protected by Ohio Rev. Code § 4112.  Nor do the Parties disagree that a termination constitutes an adverse action.  The Parties do, however, dispute prong two—whether Mr. Schofield was qualified for the position—and whether Mr. Schofield can establish the fourth prong of the *prima facie* case.

With respect to the second prong, Mr. Schofield's qualification for the position, Amazon makes a fleeting footnote argument that Mr. Schofield was not qualified because the issues leading up to his termination indicate that he was unable to follow company policy.  But this argument is circular on its face.  Were this the rule, employers would be able to defeat a *prima facie* case anytime an employee is ostensibly fired for misconduct or violation of company policies.  And the Sixth Circuit has "cautioned district courts against 'considering the employer's alleged nondiscriminatory reason when analyzing the prima facie case.'"  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)).  Instead, "a plaintiff can satisfy the qualification prong by showing that she performed at a level that generally met her employer's objective minimum qualifications."  *Id.*  The inquiry "should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  *Wexler*, 317 F.3d at 576.

Here, Mr. Schofield was hired as an Operations Manager only a year prior to his termination, suggesting that the individuals who hired him believed him qualified based on his education and relevant experience.  He has a Bachelor's Degree in Physics, a Masters Degree in Electro-Optic Engineering, and a Six Sigma Gold Black Belt Certification, a professional credential that, according to Mr. Schofield, "verifies excellence in using data to maximize efficient

and lean production operations." (ECF No. 26 at 2). Prior to being hired by Amazon, Mr. Schofield had held several higher-level management positions, and had never been terminated by any employer. (ECF No. 25-1 at 34-68). Moreover, the delivery station that Mr. Schofield and another Operations Manager oversaw was considered productive. Amazon designated Mr. Schofield a "Highly Valued" employee. (ECF No. 26-1 ¶ 9). Based on Mr. Schofield's background and positive job performance until the time of his termination, a reasonable jury could conclude that Mr. Schofield was qualified for his role as an Operations Manager.

A reasonable jury could also conclude that Mr. Schofield established the fourth prong of a *prima facie* case of discrimination. Generally, under the *McDonnell Douglas* framework, an employee can establish the fourth prong by showing that another employee outside the plaintiff's protected class was "similarly situated in all relevant respects," but treated differently. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The "similarly situated" inquiry often includes considerations like similarity between job responsibilities and the relative seriousness of the employees' conduct. *Id.* But in the age discrimination context, a plaintiff may also establish a *prima facie* case by showing that he was replaced by someone "substantially younger" than him. *See Collins*, 153 N.E.3d 484, 490-91.

The Parties devote most of their arguments on this prong to whether a comparator exists for Mr. Schofield. Mr. Schofield posits that Ms. Rohrer, the employee who accused him of asking that she work off-the-clock, and his peer Operations Manager, Mr. Sepac, are viable comparators. (ECF No. 26 at 15). But Ms. Rohrer, although she did work far too many days in a row, is not Mr. Schofield's peer such that she can serve as a comparator. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 894 (6th Cir. 2020) (explaining that "[f]iring the most senior employee responsible for mismanagement while maintaining, or even promoting, their subordinates, despite

11

their involvement in the mismanagement, is an employment practice that is not unorthodox and is in fact common in some industries). And while Mr. Sepac was Mr. Schofield's direct peer, managing the same night shift during the other half of the week, Amazon points out that there is no evidence that Mr. Sepac was ever investigated or disciplined for asking an employee to work off-the-clock. (ECF No. 29 at 10). Indeed, Mr. Schofield presents no evidence that Mr. Sepac ever even *engaged* in such conduct or comparably serious conduct. Therefore, the comparator route to establishing a *prima facie* case is unavailable to Mr. Schofield.

The Parties devote considerably less airtime to the fact that Mr. Schofield was replaced by someone thirteen years his junior, even though it is the stronger argument. Originally, both ADEA and § 4112 jurisprudence, only allowed plaintiffs to establish a prima facie case along these lines if the plaintiff was replaced by "a person not belonging to the protected class," i.e., younger than 40. *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 575 N.E.2d 439. In *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996), however, a unanimous Supreme Court modified the fourth element of a *prima facie* ADEA case to require only that the replacement be "substantially younger" than the terminated employee. Although the Ohio Supreme Court is "not bound to apply federal court interpretation of federal statutes to analogous Ohio statutes," it has generally "looked to federal case law when considering claims of employment discrimination brought under the Ohio Revised Code." *Coryell v. Bank One Tr. Co. N.A.*, 2004-Ohio-723, ¶ 15, 101 Ohio St. 3d 175, 179. Accordingly, in 2004, it extended the *O'Connor* modification to § 4112. *Id.* Although "[t]he term 'substantially younger' as applied to age discrimination in employment cases defies an absolute definition," and should be "determined after considering the particular circumstances of each case," age gaps of over ten years are almost considered substantial. *Id.* at n.5 (collecting cases). Particularly when Plaintiff's age at the time of termination—64—was

12

approaching a typical retirement age, and Plaintiff's replacement was a standard mid-career age—51—an inference of age discrimination is reasonable. Accordingly, a reasonable jury could conclude that Mr. Schofield has established a *prima facie* case of age discrimination under Ohio Rev. Code § 4112.

### B. Nondiscriminatory Justification

Because Mr. Schofield has established a *prima facie* case of age discrimination, the burden shifts to Amazon to proffer a legitimate, non-discriminatory reason for terminating Mr. Schofield. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Amazon explains that it terminated Plaintiff because "Amazon's investigation determined he instructed Rohrer not to clock in after he called her into work as a Yard Marshal on October 19, 2021." (ECF No. 25-2 ¶¶ 30-32). As Amazon points out, the falsification of time records is a permissible, non-discriminatory reason to fire an employee. *See Green v. Cent. Ohio Transit Auth.*, 647 F. App'x 555, 562 (6th Cir. 2016) (finding that the falsification of time records was a legitimate, non-discriminatory reason to terminate an employee).

### C. Evidence of Pretext

Given that Amazon has rebutted the presumption raised by Mr. Schofield's *prima facie* case, the burden now shifts back to Mr. Schofield to establish that Amazon's non-discriminatory justification was a pretext for age discrimination. This Court is "not to act as a super personnel department that second guesses employers' business judgment," *Corell v. CSX Tansp. Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010), but must instead determine "whether the employer gave an honest explanation of his behavior," *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Generally, "[a] plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient

to warrant the action." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). The first and second methods boil down to attacks on the credibility of the employer's proffered reason, either by showing that the employer "did not actually have cause to take adverse action against the employee based on its proffered reason" or that other employees "were not fired even though they engaged in substantially identical conduct." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006). The third method "admits that the [proffered] reason could motivate the employer but argues that the illegal reason is more likely than the proffered reason to have motivated the employer." *Id.* Plaintiffs are "free to pursue arguments outside these three categories," however, as the pretext inquiry is a flexible one. *Miles*, 946 F.3d at 888.

Primarily, Mr. Schofield argues that Amazon's investigation into the conduct for which he was fired was so sparse as to suggest pretext. He also points out that the people who fired him erroneously told him that he was unable to appeal the decision, and that a former colleague of his, Bob Johnson, also believed that the reasons proffered for his own termination were a pretext for age discrimination. Amazon refutes all of Mr. Schofield's attempts to show pretext, and raises a few others, including the absence of ageist remarks and the absence of shifting rationales for Mr. Schofield's termination. Although the burden of showing pretext rests with Mr. Schofield, this Court first briefly addresses two arguments that Amazon raises affirmatively in its Motion.

### 1. Absence of Ageist Remarks

Amazon argues that Mr. Schofield cannot show pretext, at least in part, because he has no evidence of ageist remarks made by anyone at the company. But this point does not hold much weight. Even though overt ageism could certainly raise the specter of pretext, *see Blizzard v. Marion Technical College*, 698 F.3d 275, 287 (6th Cir. 2012), the *McDonnell Douglas* burden-

shifting framework only applies when a plaintiff seeks to prove discrimination through indirect evidence.

Traditionally, a plaintiff with indirect evidence could show pretext by "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). The Supreme Court cast some doubt on the viability of the latter route, however, in *St. Mary's Honor Center v. Hicks*, where it concluded that because "'pretext' means 'pretext for discrimination,'" "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." 509 U.S. 502, 519 (1993). Nonetheless, in *Reeves v. Sanderson*, the Court clarified that, in certain cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. 133, 148 (2000). Accordingly, it is reversible error when a court "proceed[s] from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Id.* at 149. So, in evaluating pretext as the final step in the framework, this Court remains careful not to measure the strength of Plaintiff's evidence against cases in which there are smoking gun discriminatory statements.

A *prima facie* case and a showing of falsity may not always be enough, however, for a factfinder to conclude that the action was discriminatory. As *Reeves* explained, for example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148.

### 2.  *Shifting Rationales*

And because it informs the remainder of the analysis, this Court also briefly addresses Amazon's assertion that its rationales for terminating Mr. Schofield have not shifted since he left Amazon's employ.   "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996) *am. on other grounds*, 97 F.3d 833 (6th Cir. 1997).  Although Mr. Schofield was initially investigated because Ms. Rohrer stated that he had offered to delete her punches for October 23, he was specifically told that he was being terminated for asking Ms. Rohrer to work off-the-clock on October 19.   Indeed, at times in its briefing and at argument, Amazon states, without qualification, that Mr. Schofield was fired for allegedly asking Ms. Rohrer to work off-the-clock on the 19th.

At other times, orally and in writing, Amazon blends the two incidents, bolstering the appearance of its position through repeated references to the October 23 incident for which Mr. Schofield was *not* fired.  Amazon's muddying of the waters is troubling.  But it is not the sort of rationale shifting that indicates pretext.  By contrast, in *Cicero v. Borg-Warner Automotive, Inc.*, an employer told employees that they were being replaced due to a corporate acquisition but then, during litigation, claimed poor performance.  280 F.3d 579, 583 (6th Cir. 2002).  In other words, "the initial reason management gave for firing the plaintiff in *Cicero* was categorically different from the reason proffered during litigation." *MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012).  That sort of incompatible shift in rationale is the sort that suggests pretext.  *Id.*

Here, to the extent that Amazon now suggests that the alleged October 23 conduct formed part of the basis for Mr. Schofield's termination, "providing *additional* non-discriminatory reasons

16

that do not conflict with the one stated at time of discharge does not constitute shifting justifications." *Id.* Nonetheless, this Court will train its analysis of the relevant investigation on the reason given to Mr. Schofield when he was terminated: his alleged request that Ms. Rohrer work off-the-clock for an hour on October 19.

### 3. The Investigation into October 19

Having narrowed the conduct at issue to the conduct for which Amazon told Mr. Schofield he was fired, this Court considers whether the investigation of that conduct was so lacking as to indicate pretext. Where an "employer can demonstrate an honest belief in its proffered reason . . . the inference of pretext is not warranted." *Joostberns*, 166 F. App'x at 791. This principle is known as the "honest belief rule." *Id.* An "employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012). "Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish it 'reasonably reli[ed] on particularized facts that were before it at the time the decision was made.'" *Id.* (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). That is, even if the employer is found to have been mistaken about the factual basis for the termination, so long as it had an honest belief at the time, a plaintiff cannot establish pretext.

To overcome an invocation of the "honest belief rule," a "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant . . . did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). The Sixth Circuit does not "require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). But "if the

17

employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Id.* at 807 (6th Cir. 1998) (quoting *Fischbach v. D.C. Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). In other words, "the employee must show that a reasonable jury could, based on the failure to conduct a deeper investigation, conclude that the investigation was a sham." *Hendershott v. St. Luke's Hosp.*, 2020 WL 60187, at \*9 (N.D. Ohio Jan. 6, 2020), *aff'd*, 2020 WL 6256869 (6th Cir. Aug. 25, 2020).

Amazon insists that its investigation was well corroborated. But with respect to the conduct for which Mr. Schofield was fired, it was not. It points to Ms. Rohrer's timecard, which indicates that she did not clock in around 11 p.m. on October 19. Similarly, the record includes a statement from another employee indicating that she saw Ms. Rohrer at work around 11 p.m. on the 19th. But this evidence is immaterial; no one contests that Mr. Schofield asked Ms. Rohrer to report to work around 11 p.m. that day. The disagreement is about whether he asked her to do so without clocking in. Nor does the statement from Mr. Puff lend support to Ms. Rohrer's allegations about off-the-clock work. Mr. Puff reported that on November 2, he overheard Ms. Rohrer and Mr. Schofield discussing "deleting punches." According to Mr. Puff, the two specifically discussed the possibility of Ms. Rohrer getting her punches deleted with respect to a Saturday. October 23, 2021 was a Saturday; October 19 was not.

Given that there is no meaningful corroboration to Ms. Rohrer's allegation that Mr. Schofield asked her to work off-the-clock on October 19, it is particularly glaring that Amazon apparently failed to ever ask Mr. Schofield whether he had indeed asked Ms. Rohrer to work off-the-clock. The record makes clear that it was Amazon HR's practice to solicit incident statements. Indeed, Amazon HR asked Mr. Schofield and Ms. Rohrer for signed statements regarding the October 23 incident, had Ms. Rohrer amend her October 23 incident statement to reflect her

18

allegations about October 19, and asked at least two other employees for brief statements that appear in the record. Amazon provides no such statement from Mr. Schofield regarding October 19. While Mr. Brinkman, the second HR staffer, says he "spoke with Mr. Schofield" after Ms. Rohrer reported the October 19 incident, Mr. Brinkman does not explain what he spoke with Mr. Schofield about, (ECF No. 25-2 at 4 ¶ 27), and Mr. Schofield adamantly denies having heard about October 19 before his termination.[1]

Although employers are not obligated to give employees an opportunity to explain away misconduct, particularly when the conduct is already established by irrefutable evidence, *see Hale v. Mercy Health Partners*, 617 Fed. App'x 395, 400 (6th Cir. 2015), the October 19 incident amounts to little more than he-said, she-said, except Amazon never even inquired as to the he-said half of the equation. The investigation into October 19 certainly falls short of "optimal," and leaves the impression that Amazon was in a rush to get Mr. Schofield out of the door. But it is not clear that Amazon made errors "so obvious" that they must have been intentional and can, therefore, overcome Amazon's assertion of honest belief alone. *See Seeger v. Cincinnati Bell Telephone, Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) (explaining that "an 'optimal' investigation—i.e., interviewing the employee and some or all of his witnesses—is not a prerequisite to application of the honest belief rule."); *but see Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 597 (6th Cir. 2014) (Clay, J., dissenting) (opining that "this Court should expect that any reasonable employer," armed with the inconsistent results of a "brief" investigation, including

---

[1] During oral argument, counsel for Amazon indicated that Mr. Schofield may have had a conversation with his supervisor, Mr. Hampton, about the October 19 incident prior to his termination. But it appears that counsel has again confused—or conflated—October 19 and October 23: Mr. Schofield's deposition includes a line of questioning about whether Mr. Hampton spoke with Mr. Schofield about Ms. Rohrer working twelve days in a row, not regarding October 19 and the alleged request to work off-the-clock. (ECF No. 25-1 at 40-41).

19

an interview of the Plaintiff, "would conduct further inquiries before proceeding with an adverse employment action."). Were a reasonably jury to believe Mr. Schofield's telling, however, the threadbare investigation of October 19 could support a conclusion that Amazon's proffered reason was pretextual. Plus, the investigation is not the end of the story.

### 4. Amazon's Purported Failure to Follow Company Appeal Procedures

Mr. Schofield also points out that Mr. Hampton and Mr. Brinkman informed him that the decision to terminate him was "final." (ECF No. 25-1 at 45). Two weeks later, he learned that he would have had a right to appeal within seven days, but he was not permitted to lodge an untimely appeal. (*Id.* at 47). At oral argument, Amazon refuted that supervisors like Mr. Schofield had a right to appeal termination for alleged timecard falsification, but curiously explained that hourly employees have a right to appeal termination for other timecard issues. The record remains unclear on this point.

A "failure to follow internal disciplinary procedures can be evidence that an employee's poor performance was not the real reason for her termination." *Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 846 (6th Cir. 2015). While "not every technical failure to follow disciplinary protocol is necessarily evidence of pretext," *id.*, and minor departures from policy alone are not enough, *see White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005), effectively preventing Mr. Schofield from exercising Amazon's appeal mechanism, coupled with a rushed investigation, supports an inference of pretext. Coupled with the conspicuously scant investigation into October 19, were a jury to accept Mr. Schofield's explanation of events around his thwarted appeal, it could conclude that Amazon did not hold an honest belief in its proffered basis for Mr. Schofield's termination.

20

### 5.   Other Evidence of Pretext

Mr. Schofield also highlights a few weaker pieces of pretext evidence that lend minimal support.  *First*, Mr. Schofield points to the fact that Amazon's Central Ohio Managers participated in a meeting on November 3, where Amazon explained that they were overstaffed in the region and several managers would be redeployed.  But as Amazon points out, it routinely retained overstaffed managers until a new role could be found.  That Mr. Schofield previously benefited from this practice when he was moved between delivery centers earlier in 2021 weakens his suggestion that overstaffing, coupled with a desire to cull older managers, was the real reason behind his firing.  But in refuting the notion that it fires overstaffed employees, Amazon also forecloses overstaffing as a potential non-discriminatory basis for terminating Mr. Schofield.  On balance, the evidence in the record of overstaffing favors neither party.

*Second*, Mr. Schofield's gesture to the termination of a former colleague, Bob Johnson, as evidence of another ostensibly ageist firing brings little to the table at this juncture.  According to Mr. Schofield, Mr. Johnson was well respected at the company and expressed after his termination that he believed the accusations for which he was fired were a pretext for age discrimination.  Such "me too" evidence is generally disfavored in this Circuit, but it may be admissible if the plaintiff can "show that the same actors, reasons, and other circumstances were involved."  *Geiger v. Pfizer, Inc.*, No. 2:06-CV-636, 2009 WL 1026479, at *9 (S.D. Ohio Apr. 15, 2009) (Marbley, J.).  But as Amazon points out, Mr. Johnson was more senior than Mr. Schofield and was terminated for allegedly submitting duplicate expense reports, which is different misconduct.  Moreover, absent more factual context, it is impossible to reach any conclusions about whether Mr. Johnson's hunch that he was fired due to his age is indeed correct.  In fact, Mr. Schofield conceded in his deposition that he was speculating about the reasons for Mr. Johnson's termination.  (ECF No. 25-1 at 21).

Such speculation cannot assist Mr. Schofield in surviving summary judgment, *see DeVore v. United Parcel Serv. Co.*, 2023 WL 2181139, at *3 (6th Cir. Feb. 23, 2023), although a decision on the admissibility of evidence about Mr. Johnson's termination will be reserved for trial, *see Geiger*, 2009 WL 1026479, at *9.

In sum, a reasonable jury could conclude that the thin investigation into alleged misconduct by the Delivery Station's oldest manager, coupled with Amazon erroneously informing him that the decision was unappealable, indicate that Amazon's proffered reason for firing Mr. Schofield was pretextual.

## IV.    CONCLUSION

For the reasons set forth above, this Court **DENIES** Amazon's Motion for Summary Judgment.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  May 31, 2024**